# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARLENE B. WHITNEY, <br><br> Petitioner, <br><br> vs. <br><br> GLORIA HENRY, Warden, <br><br> Respondent. | CASE NO. 98cv2010 BTM (RBB) <br><br> **ORDER** <br><br> **(1) DENYING PETITIONER'S MOTION FOR RECONSIDERATION OF DENIAL OF SUMMARY JUDGMENT [Doc. # 83]** <br><br> **(2) DENYING EVIDENTIARY HEARING** <br><br> **and** <br> **(3) REAFFIRMING JUDGMENT DENYING PETITION** |

By order filed November 16, 2004, the Ninth Circuit remanded Petitioner Arlene B. Whitney's petition for writ of habeas corpus. The Ninth Circuit remanded the case for reconsideration in light of Missouri v. Seibert, 542 U.S. 600 (2004). Following briefing and oral argument held on September 21, 2005, the Court denied the parties' cross-motions for summary judgment. However, it permitted discovery to ascertain whether, at the time of Whitney's confession, the Oceanside Police Department had a deliberate two-step interrogation strategy designed to circumvent Miranda. See id. at 621-22 (Kennedy, J., concurring); Docket # 74 (order granting application for issuance of subpoena). Respondent introduced the only additional evidence in the form of three declarations from the detectives involved in the investigation. No evidence of any Oceanside Police Department formal or

informal custom or training designed to circumvent Miranda has been introduced.

Currently before the Court is Petitioner's motion for reconsideration of its previous denial of summary judgment regarding claims one and two of the habeas petition. Petitioner argues that Kaua v. Frank, 436 F.3d 1057 (9th Cir. 2006), and the Ninth Circuit interpretation of Seibert in United States v. Williams, 435 F.3d 1148 (9th Cir. 2006), compel issuance of the writ. For the reasons discussed below, the motion is **DENIED**.

I.    BACKGROUND

The Court incorporates by reference the facts as presented in Judge Brooks's Report and Recommendation ("R&R") filed October 19, 2000. See Docket # 29. By order filed January 18, 2002, this Court adopted in part and rejected in part Judge Brooks's R&R. While this Court agreed with Judge Brooks's analysis of the statute of limitations, exhaustion, and sufficiency of the evidence issues, it disagreed with his conclusion that the state court determination that the admission of Whitney's videotaped confessions was harmless error was a reasonable application of clearly established Supreme Court precedent. It found instead that the admission of these confessions, made both before and after administration of Miranda warnings, had a substantial and injurious effect on the jury's verdict. Nevertheless, the Court denied the petition because it found the post-Miranda statements admissible under Oregon v. Elstad, 470 U.S. 298 (1985). The Court granted Whitney a certificate of appealability, and on February 19, 2002, she filed a notice of appeal and a motion for appointment of counsel. This Court granted Petitioner's motion and appointed the Federal Defenders of San Diego to represent her.

On December 8, 2005, following remand and the Court's authorization of discovery, Whitney filed a motion for summary judgment regarding claim two of her petition, which contended that her post-Miranda confession should not have been admitted at trial. Whitney argued that the Miranda warning did not fully advise her of her rights. By order filed April 12, 2006, the Court denied the motion. See Docket # 88. Whitney filed the current motion for reconsideration on March 9, 2006.

## II. DISCUSSION

The mater is presently before the Court on remand from the Ninth Circuit for reconsideration in light of Missouri v. Seibert. The Court previously denied Petitioner's motion for summary judgment without prejudice, but permitted discovery of Oceanside Police Department records requested by the parties relating to the training of Detective McDonough. Discovery has been completed and Petitioner now moves for reconsideration of her previous motion. All of the facts relating to the issue on remand are before the Court. Therefore, the Court can proceed to address the reconsideration of its previous judgment in light of Seibert as directed by the Ninth Circuit.

### A. Applicability of Kaua and Van Lynn

Whitney first argues that the Court erred in its initial denial of the writ. She bases her argument on the decisions in Kaua, 436 F. 3d 1057, and Van Lynn v. Farmon, 347 F.3d 735 (9th Cir. 2003). Whitney interprets these cases to mean that the Court, in reviewing the state court decision, may only rely on reasoning offered by the state court in rejecting the Miranda claim. She contends this Court erred in finding that her post-Miranda statements were admissible because it is an impermissible alternative basis for denying the writ.

Kaua and Van Lynn are factually distinguishable, however. In Van Lynn, for example, the Ninth Circuit affirmed the grant of the petitioner's writ, declining to "invent an alternative rationale for the state court's decision which requires application of an entirely different and unrelated legal principle." 347 F.3d at 741. In Kaua, the Ninth Circuit held that the petitioner's sentence violated Apprendi because the state court found facts which increased the penalty for the crime beyond the statutory maximum. 436 F.3d at 1060. The court in Kaua dismissed respondent's arguments to the contrary, holding that its review was limited to the reasons given by the state court. Id. at 1061. Here, however, the state court clearly considered the Miranda issue.

In this Court's January 2002 order, the Court found that the California Court of Appeal's harmless error analysis was contrary to clearly established law. The Court concluded that admission of Whitney's confession could not have been harmless error.

However, this does not necessarily mean that an error was committed by the admission of the confession at trial. Rather, this Court further held that the Court of Appeal's determination that the admission of Whitney's confession was an error, even if harmless, was also contrary to clearly established federal law as announced in Elstad. Essentially, the decision of the California Court of Appeal included two holdings on the post-Miranda confession issue. It held that: (1) admission of the statement was error; and (2) such error was harmless beyond a reasonable doubt. This Court, in its prior ruling, reviewed both determinations and found both to be contrary to clearly established law of the United States Supreme Court. When both clear errors are remedied, the result is the denial of the Petitioner's writ. Unlike Kaua and Van Lynn, the Court is not creating a new theory upon which to uphold Petitioner's conviction. It is simply applying the correct law, as announced by the Supreme Court, to the issues decided by the state court.

**B.   Seibert/Williams Analysis**

Proceeding to the merits of Whitney's argument, the Court finds that on the record before it, neither Seibert nor Williams compel issuance of the writ. In Seibert, 542 U.S. 600, the Supreme Court considered the admissibility of a confession obtained through the use of a so-called "two-step" interrogation strategy. Under the two-step strategy, the police employed a "protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession." Id. at 604. There, the police, suspecting Seibert of murder, woke her up at 3 a.m. and took her to the police station. Once at the station, the police questioned her for 30 to 40 minutes without providing Miranda warnings. After she admitted to plotting to intentionally start a fire designed to kill, Seibert was given a 20-minute coffee and cigarette break. She was then provided Miranda warnings and waived her rights. The officer resumed questioning her, confronting her with her pre-warning statements. She confessed to the murder. 542 U.S. at 604-05. Importantly, an officer from the police department that arrested Seibert testified that the department "promoted" the two-step interrogation strategy. Id. at 609.

Seibert moved to suppress both the pre and postwarning statements. The trial court

suppressed the prewarning statement but admitted the post-<u>Miranda</u> statement. Justice Souter, writing for four Justices, voted to suppress the self-incriminating statements. Despite the fact these statements were made after an informed waiver of <u>Miranda</u>, Justice Souter described the "police strategy [as] adapted to undermine the *Miranda* warnings." <u>Id.</u> at 616. He explained that the circumstances "challeng[ed] the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." <u>Id.</u> at 617. These justices reasoned that because the "question-first tactic effectively threatens to thwart *Miranda*'s purpose of reducing the risk that a coerced confession would be admitted, and because the facts here do not reasonably support a conclusion that the warnings given could have served their purpose," the post-warning statements were inadmissible. <u>Id.</u>

Justice Kennedy, concurring in the judgment, rejected Justice Souter's approach, preferring "a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." <u>Id.</u> at 622. Justice Kennedy instead proposed that the "admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed."[1] <u>Id.</u>

In <u>United States v. Williams</u>, 435 F.3d 1148, the Ninth Circuit interpreted <u>Seibert</u>. Because <u>Seibert</u> did not produce a majority opinion, its holding remained an open question in the Ninth Circuit. <u>See</u> <u>United States v. Rodriguez-Preciado</u>, 399 F.3d 1118, 1141 (9th Cir. 2005) (Berzon, J., dissenting) ("*Seibert* leaves this court in a situation where there is no binding Supreme Court . . . precedent as to the governing standard"). In <u>Williams</u>, 435 F.3d at 1150, the court held that, under <u>Seibert</u>, "a trial court must suppress postwarning confessions obtained during a deliberate two-step interrogation where the midstream

---

[1] <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985), held that a first confession obtained in violation of <u>Miranda</u>, but not coerced or involuntary, does not preclude the admission of a second confession obtained after <u>Miranda</u> warnings have been administered. <u>See also</u> Order of January 18, 2002 at 9 (Docket # 42).

*Miranda* warning was objectively ineffective." The Court held that Justice Kennedy's narrower test was <u>Seibert</u>'s holding, and that in situations "where the two-step strategy was not deliberately employed, *Elstad* continues to govern the admissibility of postwarning statements." <u>Id.</u> at 1158. <u>Williams</u> further held that a court, in determining whether an interrogator deliberately violated <u>Miranda</u>, should consider whether "objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning." <u>Id.</u> "Such objective evidence would include the timing, setting, and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements." <u>Id.</u> at 1159. "When an interrogator has deliberately employed the two-step strategy, *Seibert* requires the court then to evaluate the effectiveness of the midstream *Miranda* warning to determine whether the postwarning statement is admissible." <u>Id.</u> at 1160. The burden is on the prosecution to demonstrate that a two-step strategy was not used to undermine <u>Miranda</u> and that the <u>Miranda</u> warnings were given and effective. See <u>United States v. Ollie</u>, 442 F.3d 1135, 1142-43 (8th Cir. 2006) (citing <u>Brown v. Illinois</u>, 422 U.S. 590, 603-04 (1975) and <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986)).

### 1.    Deliberate Employment of the Two-Step Procedure

Here the objective evidence clearly supports a finding that Detective McDonough did not deliberately violate <u>Miranda</u> by employing a two-step interrogation procedure. First, it is clear that McDonough attempted to stop Whitney from confessing before she was given her <u>Miranda</u> warnings. <u>See</u> Order of April 12, 2006 at 2 (Docket # 88); Lodgment 61 (videotape of confession) at 18:04:50 - 18:05:30. Within minutes of beginning his August 28 interview of Whitney, McDonough told her that she needed to stop living a lie and tell the truth, whereupon Whitney suddenly said, "Okay, she drove us home." After Whitney said that sentence, McDonough attempted to interrupt her saying, "Look." Whitney continued with, "I was getting out of the car. She owed me money, and I dumped her shit about it . . .." McDonough immediately extended his arms and put out his hands in a motion for Whitney to stop speaking and said, "Time out." Whitney ignored McDonough's entreaties and

continued, "and she f____ing pulled a knife . . .." McDonough again extended his arms with his hands up, and said in a slightly more forceful voice, "Time out," simultaneous with Whitney saying the word "knife." Whitney still continued on and said, "and she f___ing comes at me and she . . .." McDonough made the same gesture for Whitney to stop speaking and said, "Hang on," and "Arlene." Whitney, speaking so rapidly as to be almost unintelligible on the video recording, pushes right through McDonough's directions to stop and concludes, "Knife on me and I f___ing took it away from her, and I stabbed her." As she finishes her statement, Whitney begins to cry, falls forward and puts her head in her hands. McDonough, seemingly dismayed at Whitney's refusal to heed his warnings, throws his hands up in an apparent display of frustration.[2]

Detective McDonough's efforts to stop Whitney, before she made even a "beachhead" confession, is utterly inconsistent with a subjective intent to obtain an un-Mirandized confession which would then be used to obtain an admissible confession once Miranda warnings were given. The Court finds that the incongruity between McDonough's actions and the actions one would expect from an officer intending to obtain a confession which could then be used to extract a post-Miranda confession is the key fact that merits this Court to find that Detective McDonough did not employ a "two-step interrogation technique . . . in a calculated way to undermine the *Miranda* warning." Seibert, 542 U.S. at 622 (Kennedy, J., concurring).

Similarly, the Court has held that while the events surrounding the interrogation of Whitney "could be considered psychologically coercive, [any coerciveness] was not caused by any improper police tactics." Order of January 18, 2002 at 14-15. The confession did not result from McDonough's repeated questioning of Whitney; in fact, the confession came shortly after McDonough began talking to her. Unlike Seibert, for example, where the police

---

[2] The Court notes that a proper understanding of the relevant facts in this case is not possible without viewing the videotape of the Petitioner's confession. The transcript of these events which transpired in the interview room (see Lodgment 43 at 629-30) contains only a rough approximation of the timing of certain key statements and completely fails to capture the important non-verbal actions of Detective McDonough in attempting to stop Petitioner from continuing to speak before he could properly apprise her of her rights.

awoke the suspect in the middle of the night and apparently wore the suspect down over a 30-40 minute interview, 542 U.S. at 604-05, McDonough did not "grill" Whitney with questions suggesting that he knew that she had in fact committed the murder. Even Whitney concedes that the initial interrogation was not "complete or detailed." Petitioner's Mem. at 23. These objective factors suggest that McDonough did not deliberately violate Miranda in order to obtain a pre-warning confession.

The lack of evidence produced in discovery is another objective factor suggesting the absence of deliberateness. The discovery permitted by the Court did not reveal any evidence of an Oceanside Police Department formal policy or custom or any training designed to circumvent or otherwise do an "end-around" Miranda. Although the Court approved a subpoena compelling the Oceanside Police Department to produce documents, see Docket # 74, the discovery apparently yielded no results. Considering these factors, it does not appear that McDonough deliberately employed a two-step interrogation technique designed to circumvent Miranda.

While there is some objective evidence that could conceivably be some support for a finding of deliberateness, such evidence does not affect the efforts by McDonough to stop Whitney from confessing before being given her Miranda warnings. It is true that there was no break between the pre and postwarning statements, and that McDonough's first postwarning question ("Did she [the victim] owe you money?") essentially made the interrogation continuous. Of course, McDonough was the only officer present during each, and he and Whitney remained in the same room for both statements. Each of these facts, it could be argued, suggest that McDonough deliberately intended to illicit a confession prior to administering Miranda warnings. Nevertheless, they do not, in this Court's view, overcome the previously discussed objective evidence suggesting no deliberateness.

Williams also directed courts to consider subjective evidence in determining whether a Miranda warning was unlawful. The subjective evidence overwhelmingly supports a finding that there was no deliberate "end-around" Miranda. Three declarations filed with the Respondent's opposition provide the subjective evidence. McDonough, the interrogating

officer, states clearly that he "did not Mirandize [Whitney] at the start of the interview based on [his] belief she was free to leave." McDonough Decl. ¶ 13. He further states that he did not know what she was going to say and that he "had no thought or intention of violating Whitney's Miranda rights." Id. ¶¶ 13-14. Additionally, he denies ever having been trained to violate Miranda and states that he was never trained in a two-step interrogation technique. Id. ¶ 16.

The Court credits these statements and finds that Detective McDonough's belief that Whitney was not in custody at the time he began his August 28 interview was not wholly unreasonable. Whitney offered to voluntarily come to the police station, without even being asked, and then was left alone and unguarded on the couch in the lobby of the reception area. Id. ¶¶ 6, 8. When McDonough did decide to interview Whitney, he "asked her if she would come with [him] to an interview room," and she agreed. Id. ¶ 10. Thus, all interactions with Whitney were entirely consensual to this point. While he did lock Whitney in the interview room, McDonough explains that this was "because [he] planned to go to [his] office to make phone calls . . . and [he] could not have her wandering around the crimes of violence area." Id. McDonough then placed Dennis Hendrickson in with Whitney in the interview room, at Hendrickson's request, and again locked the door. He indicates that he did this "for officer safety reasons because [he] was still alone [at the station]." Id. ¶ 11. McDonough's belief that his brief deprivation of Whitney's liberty for safety reasons did not constitute custody was not unreasonable and the Court finds that this was the reason why he failed to Mirandize Whitney immediately upon commencing the interview. See, e.g., United States v. Booth, 669 F.2d 1231, 1236 (9th Cir. 1981) ("Strong but reasonable measures to insure the safety of the officers . . . can be taken without necessarily compelling a finding that the suspect was in custody."); c.f. United States v. Bautista, 684 F.2d 1286, 1289 (9th Cir. 1982) ("A brief but complete restriction of liberty, if not excessive under the circumstances, is permissible during a *Terry* stop and does not necessarily convert the stop into an arrest.")

The other declarations submitted in opposition come from two other Oceanside detectives, Michael Porretta and Brian Whitbread, who were involved in the Jensen murder

1  investigation. Each states that the Oceanside Police Department did not have any "written
2  or unwritten policy or practice to violate, in any way, a suspect's Miranda rights" during their
3  respective employment with the Department. Poretta Decl. ¶ 3; Whitbread Decl. ¶ 3. Each
4  also stated that they had worked for the Oceanside Police Department since the early 1980's,
5  over ten years before the crime at issue here occurred. Both, like McDonough, deny ever
6  having received any training in a two-step interrogation technique designed to secure a pre-
7  Miranda confession. Poretta Decl. ¶ 4; Whitbread Decl. ¶ 4. This subjective evidence further
8  supports a finding of no deliberateness.

9        Whitney argues that the fact that McDonough brought the Miranda form into the
10 interrogation room shows that subjectively he anticipated a confession from Whitney.
11 Nevertheless, this is explicitly refuted by McDonough's declaration, which states that this was
12 "standard practice . . . simply to be prepared for anything that might happen during a
13 statement." McDonough Decl. ¶ 13. Indeed, the encounter between Hendrickson and
14 Whitney (which McDonough watched on video) did not make clear that Whitney was in fact
15 the murderer. She did not admit to Hendrickson that she was the murderer or explicitly state
16 that she was prepared to confess her involvement. She did, however, make some
17 statements from which it could be inferred that might implicate herself. For instance, at one
18 point, Hendrickson, breaking down and muttering that he did not know what to do, stated that
19 he would just tell them he did it. Lodgment 61 at 17:56:00 - 17:56:46. Whitney immediately
20 responded: "Oh, shut up. Dave did it. Well now you told them I did it (unintelligible) go for
21 it because hey, you know what, I was the only other one there (unintelligible) Dave. So
22 what?" She then continues and states: "I don't care. I'm through. I don't give a f___." Id.
23 at 17:56:46 - 17:57:01. Whitney proceeded to call out for McDonough and continued calling
24 for him a number of times over the next two minutes. When McDonough opened the
25 interrogation room door, Whitney told him: "I'm ready, (unintelligible) lock me up." Id. at
26 17:57:04 - 17:59:10.

27       McDonough obviously may have had suspicions that Whitney was involved in the
28 killing of Jensen and he even expressed those suspicions in beginning his interview with

Whitney. Id. at 18:01:00 - 18:01:45 ("I don't know what happened, Arlene. I have my suspicions, but I don't know.") These suspicions could only have been heightened by Whitney's announcing that she was ready to be locked up. However, the Court credits McDonough's reasonable belief that, at that time, "[he] did not have enough clarity as to what the truth was to prevent [Whitney] from leaving if she wanted to." McDonough Decl. ¶ 13. Thus, he did not Mirandize Whitney because she was not under arrest. Whitney's argument that McDonough's entry with a notebook containing a standard Miranda warning reveals his subjective intent to violate Miranda is therefore not convincing.

In short, the undisputed evidence compels the Court's finding that Detective McDonough did not employ a deliberate strategy to circumvent Miranda. The most compelling piece of objective evidence is the fact that McDonough tried to stop Whitney from confessing. Additionally, discovery did not produce any evidence of policy or training which would suggest a violation of Seibert. Finally, the subjective evidence also supports a finding that there was no deliberate two-step interrogation. Because the Court finds that there was no deliberate two-step interrogation of Whitney, the Elstad standard of determining voluntariness controls. See Williams, 435 F.3d at 1158. As the Court previously held, Whitney's post Miranda confession was admissible under Elstad. Docket # 42 at 9-15.

### 2. Effectiveness of the Midstream Miranda Warnings

The application of Seibert to any confession obtained with a "midstream" Miranda warning is outlined in Williams as a two-step test. First, a court must determine whether Miranda warnings were deliberately withheld. If the deliberate employment of a two-step strategy is established, then a court must evaluate "whether the midstream warning adequately and effectively apprised the suspect that he had a 'genuine choice whether to follow up on [his] earlier admission.'" Williams, 435 F.3d at 1160 (quoting Seibert, 524 U.S. at 616). The Court need not reach the second step in the Williams test in this case because it has already determined above that Miranda warnings were not deliberately withheld as part of a two-step interrogation technique. Nonetheless, given the considerable duration of these proceedings and the remand, for completeness, the Court will proceed to examine the

1  effectiveness of Detective McDonough's midstream warnings.

2  The Ninth Circuit, in accordance with the Seibert ruling, has determined that the effectiveness of the midstream warnings should be determined based upon an examination of the objective circumstances surrounding the interrogation, including whether any curative measures were taken to ensure that a suspect would understand the import and effect of the Miranda warnings. Williams, 435 F.3d at 1160. Many of the factors to be examined are the same as the objective evidence the Court is directed to consider for its possible support of an inference that the two-step interrogation procedure was deliberately used. The Court must address: "(1) the completeness and detail of the prewarning interrogation, (2) the overlapping content of the two rounds of interrogation, (3) the timing and circumstances of both interrogations, (4) the continuity of police personnel, (5) the extent to which the interrogator's questions treated the second round of interrogation as continuous with the first and (6) whether any curative measures were taken." Id.

14  To begin, the Court has already indicated above that Petitioner admits the prewarning interrogation was not complete nor detailed. Rather, Whitney's prewarning statements consisted of a single inculpatory admission of stabbing Jensen mixed within a quick description of the circumstances, which supported her self-defense argument. Thus, while the postwarning interrogation began by using Whitney's admission that Jensen owed her money, the content of the two rounds of interrogation included very little overlap because of the brevity of the first statement. Importantly, the prewarning confession did not even explain how Jensen was killed. As Whitney later revealed in her postwarning confession, which was extremely detailed and lasted several hours, Jensen was probably killed by the blunt-force trauma of a rock to her head. Moreover, it seems clear that Whitney did not agree to talk after being given her Miranda warnings because she felt compelled to explain her prewarning admission, as she proceeded to then deny her earlier admission of stabbing Jensen. See Lodgment 61 at 18:25:50 - 18:26:15 ("*McDonough*: Well, somebody stabbed her too. *Whitney*: Not in the (unintelligible) fight. I don't know. *McDonough*: Come on. Tell all the truth. It's got to come out. *Whitney*: I don't remember the stabbing, no. I know she, I mean,

she stabbed me in the hand. She cut my hand. I know that. Okay? The rest is just trying to keep her from stabbing Julie or anything."). Over two hours later, after Whitney had run through her version of the events entirely, McDonough asked if there was anything else she needed to add that she hadn't told him. Only then did Whitney re-admit her stabbing of Jensen and explain that it occurred in defending herself. See Lodgment 62 at 20:45:50 - 20:47:25.

As indicated above, the Court recognizes that no break was given between the two rounds of interrogation, that they were basically continuous and that Detective McDonough performed both. In addition, McDonough never employed the curative measure of explaining to Whitney that her prewarning statement would likely be inadmissible against her.[3] However, the Court finds that McDonough's actions, both in trying to stop Whitney from making incriminating statements before he could Mirandize her, and in explaining the new situation once Whitney inculpated herself, "allow[ed] the accused to distinguish the two contexts and appreciate that the interrogation had taken a new turn." Seibert, 542 U.S. at 622 (Kennedy, J., concurring).

Detective McDonough, who had been imploring Whitney to tell the truth, suddenly switched gears in a very noticeable manner as soon as Whitney indicated that she might incriminate herself by admitting she was in the car with Jensen. He held his arms up and repeatedly declared "time out" and "hang on." When Whitney ignored his directions and concluded her admission of stabbing Jensen, McDonough clearly announced that the interrogation was taking a new turn: "Listen to me. . . . Look, if you're telling me you did it, then I'm gonna stop this interview right now and I'm gonna read you your rights." Lodgment 61 at 18:05:26 - 18:05:36. The Court recognizes that some of McDonough's statements leading up to his giving of the Miranda warnings may have confused Whitney somewhat ("I'm not saying you're under arrest. I'm just telling you you have rights.") or even possibly worked some undermining of the appraisal of the right to remain silent ("I know that I have Dave in

---

[3] Although such an explanation would not be expected due to McDonough's belief at that time that Whitney was not in custody until she made her incriminating prewarning statement.

jail over there. And if he didn't do it, Arlene, I've got to get him out of jail."). Id. at 18:05:36 - 18:05:54. Nonetheless, the clear import of McDonough's actions was that Whitney was in a new situation now. The required Miranda warnings were given and Whitney indicated that she wanted to talk to McDonough, signed a Miranda waiver form to that effect, and proceeded to give her confession.

The Court finds that an examination of Whitney's confession reveals that she understood her right to remain silent, but decided to waive that right in favor of attempting to tell a version of the events which would support her self-defense argument. In the first run-through of the story following the Miranda warnings, Whitney did not even repeat her admission that she had stabbed Jensen at all, just that Julie Moore hit Jensen on the head with a rock and they had left her dead body in a ditch. Lodgment 61 at 18:08:03 - 18:11:45. Thus, it seems Whitney understood her rights and decided upon a path of telling an exculpatory story. See, e.g., Whitney's numerous exculpatory claims (Lodgment 61 at 18:12:48 - "We didn't mean to kill her"; 18:33:38 - "We didn't mean to kill her. We were just trying to stop her"; 18:42:27 - "I didn't want to murder her. We didn't mean to murder her"; 18:51:50 - "It isn't my fault. I didn't start off to hurt nobody"; Lodgment 62 at 21:07:44 - "It wasn't intentional. It really wasn't intentional"; 21:27:48 - "This wasn't intended, okay?"; 21:31:09 - "We're not murderers, we're not.")

After more than four hours, it started becoming clear that McDonough and the other two detectives who had joined the interview were not believing Whitney's story. See Lodgment 63 beginning at 22:16:30. Whitney continued to push her self-defense story. See, e.g., Lodgment 63 at 22:18:49 ("She's already stabbed me in the hand first. She was trying to jab me, she was trying to stab me in the stomach.") However, within a few minutes, the detectives' open skepticism about her story had alerted Whitney to the reality that her choice to talk was failing. See Lodgment 63 beginning at 22:21:15. She soon verbalized this realization: "Now nobody's going to believe it now. Nobody's going to believe it then, okay, and so I didn't say anything then, so that's why I'm in the f___ing shit I am now, okay? So, like, I'll go down (unintelligible) . . . I'll pay for this." Lodgment 63 at 22:28:00. After a break,

McDonough asked Whitney to take a polygraph test - a clear indication that the detectives were not believing her story of self-defense - and also asked her if he had forced her to say anything. Only then did Whitney decide that it might be time to invoke her rights. Accordingly, she inquired of McDonough: "I should ask for a lawyer though, huh?" See Lodgment 63 at 22:49:58 - 22:50:20. The Court finds, therefore, that the midstream Miranda warning served to effectively apprise Petitioner of her rights.

### C. Petitioner's Request for an Evidentiary Hearing

Petitioner has argued that, if the Court finds that Detective McDonough's declaration creates a material issue of fact, the Court must order an evidentiary hearing "to test his implausible claims." Petitioner's Reply at 21-22. However, the Court finds that an evidentiary hearing is not required in this case because the objective evidence, which the Court has examined for itself in its numerous reviews of the videotaped interview, overwhelmingly supports the conclusion that Detective McDonough did not deliberately employ the forbidden two-step interrogation technique. Moreover, while the Court did rely in part upon McDonough's declaration in which he explains the reasons for his failure to apprise Whitney of her Miranda rights before beginning the interview, no evidence has been presented which would suggest that subjecting McDonough to cross-examination at an evidentiary hearing is likely to reveal that his credibility is suspect. Petitioner's failure to produce any countervailing evidence was not the result of a lack of discovery, as this Court ordered discovery of a broad range of materials that could have tended to impeach McDonough's contentions of good faith.

Except for situations in which 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act, precludes the granting of an evidentiary hearing, the determination of whether to hold such a hearing is "firmly committed to the discretion of the district courts." Baja v. Ducharme, 187 F.3d 1075, 1077-78 (9th Cir. 1999). In accordance with the Rules Governing Section 2254 Cases in the United States District Courts, the Court has reviewed the record of the state court proceedings, as well as the parties' submissions in this habeas proceeding, and has determined that the holding of an evidentiary hearing is

unwarranted. See Rule 8. Accordingly, the Court exercises its discretion to deny Petitioner's request for an evidentiary hearing.

### D. Applicability of the Exhaustion Requirement

The Court has made the preceding determination and considered the application of Williams despite the Respondent's contention that Petitioner is precluded from raising these claims because of a failure to exhaust. The Court disagrees with this argument because it is clear that Whitney did in fact raise the Miranda issue at the state level. The state court reached the issue, and therefore this Court can review it. The validity of a Miranda waiver depends on the totality of the circumstances. United States v. Younger, 398 F.3d 1179, 1185 (9th Cir. 2005). Respondent is simply viewing the exhaustion requirement too narrowly.

## III. CONCLUSION

For the reasons discussed, the motion for reconsideration is **DENIED**. As the Court has held that there is no basis for an evidentiary hearing, and the Court has fully reconsidered its denial of the writ in light of Seibert, there is no reason to defer a final ruling. Accordingly, the Court's judgment entered on January 18, 2002 is not modified and the denial of the writ of habeas corpus is reaffirmed. The Clerk shall enter judgment on remand accordingly.

**IT IS SO ORDERED.**

DATED: March 15, 2007

Hon. Barry Ted Moskowitz
United States District Judge